66434, 66435. GROWTH PROPERTIES OF FLORIDA, LTD., IV
v. WALLACE; and vice versa.

SHULMAN, Chief Judge.
Appellant/cross-appellee William Wallace purchased the Belvedere Apartments in December of 1973. After making substantial improvements, he sought to resell the apartments for a

profit. Wallace entered into an agreement with appellee/cross-appellant Growth Properties of Florida, Ltd., IV, whereby Growth Properties agreed to purchase an 85% interest in Belvedere, Ltd., the entity which was formed to own and operate the Belvedere Apartments. In June 1974, a limited partnership agreement was entered into between Wallace, as general partner, and Growth Properties, as the sole limited partner. The purchase price paid to appellant for this 85% interest was $280,000. Wallace deposited this money in his personal account and immediately wrote checks to Growth Properties, Inc., the managing entity and general partner of the Growth Properties syndication, for $55,000; to Howe Whitman, the broker who arranged the partnership deal, for $22,500; and to Trust Company Bank for $97,000 to pay off the loan he took out in 1973 for the initial purchase of the apartments.

Included in the 85% interest Growth Properties received were certain "preferences" regarding the receipt of income from the operation or sale of the apartments. These preferences were expressly provided for in Section 5.04 of the Limited Partnership Agreement.

"5.04 *Cash Flow Distribution Preferences* — At the sole discretion of the General Partner, the distributable cashflow of the Partnership shall be distributed subject to the following preference . . .:

"(a) The first twenty-eight thousand one hundred twenty-five dollars ($28,125.00) on an annualized yearly basis to the Limited Partner, payable quarterly. If this priority cashflow to the Limited Partner is not available in any quarter, the General Partner shall contribute the amount of such preference to the Partnership as a capital contribution and this amount will be distributed to the Limited Partner . . .

"(d) The preference to the Limited Partner is cumulative and is an *absolute obligation* of the General Partner in the event the distributable income of the partnership is insufficient to pay the same . . ." (Emphasis supplied.)

Belvedere, Ltd., filed a Chapter XII Bankruptcy Act petition in July of 1976. Prior to this action, Wallace had made quarterly payments of $7,031.25 to Growth Properties for every quarter since June 1974 except for the payments due April 1, 1976, and June 1, 1976. These payments due Growth Properties were listed among the unsecured non-priority creditors' claims and were subsequently discharged under the plan of arrangement confirmed by order of the bankruptcy court. Wallace was directed in the plan to convey his interest in the limited partnership to a person or entity designated by the trustee, and he was later replaced as general partner. In March of 1979, Belvedere, Ltd., was a victim of foreclosure by one of its secured creditors. Thereafter, Growth Properties filed this suit against

Wallace, alleging breach of the partnership agreement and fraud in the partnership transaction.

In Count 1 of the complaint, Growth Properties claimed that Wallace owed it $112,500, the payment of which Wallace allegedly personally guaranteed. In Count 2, Growth Properties based its allegation on fraud both in the alleged inducement by Wallace to cause Growth Properties to pay $280,000 to purchase its 85% interest in the property, and in the management of the property. The purchase price of $280,000 was claimed as damages. The trial court entered a directed verdict in favor of Wallace in Count 1, and the jury awarded $33,000 to Growth Properties in Count 2. Wallace appeals the jury verdict in Count 2, enumerating several evidentiary and procedural errors allegedly committed by the trial court. Growth Properties cross appeals the entry of the directed verdict in Count 1, claiming that Wallace was in effect a guarantor of the partnership's debt to Growth Properties.

1. Growth Properties contends that the trial court erred in granting Wallace's motion for directed verdict in Count 1 because Wallace had personally guaranteed the payment preferences owed Growth Properties by Belvedere, Ltd. Wallace asserts that any claim Growth Properties may have had was discharged in the partnership's bankruptcy proceeding.

As set out in the facts, Section 5.04 (d) of the Limited Partnership Agreement entered into by Growth Properties and Wallace specify that the payment preference Growth Properties was due from Belvedere, Ltd., was the "absolute obligation of the General Partner," i.e., Wallace. OCGA § 10-7-1 (Code Ann. § 103-101) states in part: "The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal, the principal in either instance remaining bound therefor . . ."[1] A surety agreement, to be enforceable, must be supported by adequate consideration (*U. S. F. & G. Co. v. Blankenship Plumbing Co.,* 153 Ga. App. 335 (2) (265 SE2d 66)), although such consideration need not be in monetary form in order to be deemed adequate. *Tennille Banking Co. v. Ward,* 29 Ga. App. 660 (116 SE 347).

In the present case, assuming, arguendo, that Wallace was a guarantor, the principal would apparently be Belvedere, Ltd.

---

[1] The distinction between a surety and a guarantor was abolished by the General Assembly in 1981. OCGA § 10-7-1 (Code Ann. § 103-101).

Consideration to support the suretyship agreement could be found in the form of Growth Properties' promise to purchase 85% of the limited partnership in return for Wallace's personal guarantee of their payment preference. Additionally, the fact that Wallace used the majority of the $280,000 purchase money to satisfy his personal debts could qualify as adequate consideration to support the agreement. On the other hand, it could be argued that since the consideration flowed directly to Wallace from Growth Properties, Wallace himself would be the principal. Nevertheless, " '[w]hether or not a party has entered into a contract of guaranty is to be determined by its substance and not by the nomenclature of the agreement.' [Cit.] Hence, the form of the contract is immaterial, provided the essential fact of suretyship exists by construction of the contents. [OCGA § 10-7-3 (Code Ann. § 103-103)]." *Griswold v. Whetsell,* 157 Ga. App. 800, 801 (278 SE2d 753).

It was formerly a well-settled theory of construction that a surety was a favorite of the law and that, therefore, all doubts and technicalities would be resolved in his favor. *Bethune v. Dozier,* 10 Ga. 235. However, it has subsequently been held that this theory, the rule of strictissimi juris, only applies to a *gratuitous* surety and that a contract involving a *compensable* surety is "construed most strongly against the surety and in favor of the indemnity which the obligee has reasonable grounds to expect." *Brock Constr. Co. v. Houston Gen. Ins. Co.,* 144 Ga. App. 860, 863 (243 SE2d 83), affd., 241 Ga. 460 (246 SE2d 316). In the instant case, Wallace was a compensated surety if he was in fact a surety at all.

Contrary to Wallace's assertion, discharge of a debt pursuant to a bankruptcy proceeding involving the principal does not in turn discharge the surety. *Phillips v. Solomon,* 42 Ga. 192; *White v. Idelson,* 38 Ga. App. 612 (2) (144 SE 802). It follows that whatever Wallace's status is determined to be, surety or principal, his obligation would not be extinguished by Belvedere, Ltd.'s bankruptcy action and the subsequent discharge of its debt to Growth Properties.

In any event, when the fact of suretyship does not exist on the face of the contract, the parties involved are permitted to either prove or disprove the existence of a suretyship relationship. *Yancey Bros. Co. v. Sure Quality &c. Contractors,* 135 Ga. App. 465, 466 (218 SE2d 142). "The question is an evidentiary one and its proper resolution requires that facts be submitted to the fact finder to determine what was the intent of the parties. 'The cardinal rule of [contract] construction is to ascertain the intention of the parties.' [Cit.] The question of the intention of the parties in this case is properly for the jury." Id., p. 466.

Therefore, the trial court erred in granting Wallace's motion for directed verdict because the issue of Wallace's status and possible liability to Growth Properties should have been submitted to the jury for a factual determination of the matter.

2. In his appeal, Wallace asserts that the trial court erred in denying his motion for directed verdict as to the fraud in the inducement claim made by Growth Properties because the statute of limitation had run before this action was initiated. Wallace claims the applicable Code section is OCGA § 9-3-31 (Code Ann. § 3-1002), which specifies a bar to legal action four years after the right of action accrues. He further claims that since the partnership agreement was entered into on June 13, 1974, and the present action was commenced on January 31, 1980, the fraud claim should be barred. However, OCGA § 9-3-96 (Code Ann. § 3-807) indicates that in a situation such as in the instant case, "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." There is nothing in the record that reveals that Growth Properties had any knowledge of Wallace's alleged fraud prior to January 31, 1976. This enumeration is therefore without merit.

3. Wallace also contends that it was error for the trial court to admit as evidence a handwritten list that allegedly signified certain personal indebtedness of Wallace to Belvedere, Ltd. This list of purported promissory notes had been compiled in 1975 by Robert Love, a representative of Growth Properties, when he and Growth Properties' attorney were in Atlanta going over the partnership's business records. Wallace argues that the list is inadmissible hearsay and was valid only to refresh Mr. Love's memory. Growth Properties asserts that it should be admitted under the business record exception to the hearsay rule or as the best evidence available of the disputed loans.

" 'A witness may refresh and assist his memory by the use of any written instrument or memorandum, provided he finally shall speak from his recollection thus refreshed, or shall be willing to swear positively from the paper.' [Cit.] This definitely allows oral testimony by a witness which the witness, absent the memorandum, would not be able otherwise to recollect . . . [I]t is generally held that the memorandum has no present evidentiary value, since 'it is not the memorandum that is the evidence, but the recollection of the witness.' [Cit.]" *Woodward v. City Council of Augusta,* 117 Ga. App. 857 (162 SE2d 304); OCGA § 24-9-69 (Code Ann. § 38-1707).

A well recognized exception to the foregoing rule is the admission into evidence of records made in the regular course of business. OCGA § 24-3-14 (Code Ann. § 38-711). However, "basic to the admissibility of a writing or a record under [OCGA § 24-3-14

(Code Ann. § 38-711)] is the requirement for *preliminary proof* as regards the document itself." *Cassano v. Pilgreen's, Inc.,* 117 Ga. App. 260, (2) (160 SE2d 439). "The evidence should include identification of the writing or record by a witness who is familiar with the method of keeping the records and who can testify thereto and to facts which show that the entry was made in the regular course of business and that it was the regular course of the business to make such memorandum or record at the time of the event or within a reasonable time thereafter." Green, Ga. Law of Evidence, 2d Ed., p. 486, § 313. See also *Martin v. Baldwin,* 215 Ga. 293, 302 (110 SE2d 344).

A review of the record in the present case reveals that no such foundation was laid by Growth Properties. Mr. Love testified only that he saw the promissory notes upon examination of Belvedere, Ltd.'s books and subsequently listed them on a separate sheet of paper. He made no mention whatsoever of regular business procedure. Even if a foundation had been laid, it is still doubtful that the list could be admitted under the business record exception. "[OCGA § 24-3-14 (Code Ann. § 38-711)] is primarily adapted to allowing testimony of business records the authentication of which is otherwise difficult against a hearsay objection because it is 'the routine product of an efficient clerical system.' Its purpose is not to bolster the witness on the stand but to serve in place of a witness by giving the manner of entry within the usual course of the business enterprise an independent prima facie probative value of its own . . ." *Calhoun v. Chappell,* 117 Ga. App. 865 (2a) (162 SE2d 300). The purpose of the handwritten list in the case at bar was undoubtedly to support the witness' contention that the promissory notes in fact existed and to alert the jury as to the amount in which Wallace was allegedly indebted to Belvedere, Ltd. The list was, therefore, impermissibly self-serving.

Growth Properties contends that the list was the "best evidence" of the alleged promissory notes since Wallace had purportedly destroyed the original notes. However, "[t]he *existence* of an original writing must be established . . . before secondary evidence is admissible." (Emphasis supplied.) Agnor, Ga. Evidence, p. 290, § 13-2. On the other hand, where the contents of a writing are only collateral, "the best evidence rule does not apply, and the existence of the writing and the contents thereof may be shown by secondary evidence." *Walls v. State,* 161 Ga. App. 235 (4) (291 SE2d 15). However, in the instant case, the list of alleged promissory notes was admitted not only to prove the notes' existence but to also prove their *amount.* Therefore, the contents of the writings were not collateral, and it follows that the existence of the promissory notes

must be proven before the list in question could be admissible as evidence.

For the foregoing reasons, the trial court erred in admitting the handwritten list of the purported promissory notes into evidence for the jury to view in the jury room during their deliberation. Mr. Love could use the list to refresh his memory as to the existence and value of the alleged promissory notes, but the list itself was thereafter inadmissible.

4. Finally, Wallace argues that the trial court erroneously admitted an affidavit of Dan McDougald, who was not a witness at trial, that directly refuted Wallace's testimony. At trial, Wallace testified that he had given all of the partnership records to McDougald, who was a trustee of one of Belvedere, Ltd.'s creditors and ultimately became the trustee for Belvedere pursuant to the bankruptcy proceedings. Growth Properties produced an affidavit signed by McDougald stating that he had never received these records from Wallace.

It has been held that "ex parte affidavits should not be allowed in evidence in any trial where the evidence is finally adjudicated because it denies the privilege of cross-examination as allowed by [OCGA § 24-9-64 (Code Ann. § 38-1705)]." *Lewis v. First Nat. Bank of Atlanta,* 141 Ga. App. 338, 340 (233 SE2d 465). See also *Camp v. Camp,* 213 Ga. 65 (97 SE2d 125); and *Royals v. State,* 208 Ga. 78 (2) (65 SE2d 158).

In light of the foregoing authority, it was error for the trial court to admit into evidence the affidavit signed by Mr. McDougald.

*Judgment reversed in Case No. 66434. Judgment reversed in Case No. 66435. McMurray, P. J., and Birdsong, J., concur.*

DECIDED OCTOBER 6, 1983 —
REHEARING DENIED NOVEMBER 18, 1983 —

*Dock H. Davis,* for appellant.
*John W. Greenfield,* for appellee.